# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2413-21
A-1371-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

M.N.,

     Defendant-Appellant,

and

J.L.K. (Deceased) and W.L.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF W.N.-L.
and I.N.-K., minors.

_____

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

Plaintiff-Respondent,

v.

M.N.,

Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.E.N.-K.,
a minor.

_____

Argued January 24, 2024 – Decided April 15, 2024

Before Judges Accurso, Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket Nos. FN-04-0410-20 and FG-04-0059-22.

Joseph E. Krakora, Public Defender, attorney for appellant (Lora Dafna Glick, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sara M. Gregory, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors W.N.-L. and I.N.-K. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie Elizabeth Goldstein, Assistant Deputy Public Defender, of counsel and on the briefs).

PER CURIAM

M.N. (Madeleine) appeals from a now-final February 2022 finding that she abused and neglected seven-year-old W.N.-L. (Wanda), and from the subsequent termination of her parental rights to Wanda's half-sister, three-and-a-half-year-old I.E.N.-K. (Izzy).[1]  Having consolidated the appeals for purposes of this opinion, we now reverse both judgments.  The trial court's finding that Madeleine abused and neglected Wanda is not supported by substantial credible evidence in the record, and the Division of Child Protection and Permanency failed, as a matter of law, to establish prongs three and four of the best interests standard of N.J.S.A. 30:4C-15.1(a) by clear and convincing proof in the guardianship action.

These are very troubling cases.  In a nutshell:  Wanda and Izzy were removed from Madeleine's care in March 2020, when she was arrested for making a false report that Wanda's father W.L. (Wally) had sexually abused Wanda — after Wanda recanted her sexual abuse allegations against her father, claiming her mother had coached her to make them.  The Division placed Wanda with Wally.  The Division placed Izzy, then a little over ten months old, with Wanda's sister, D.N. (Darcy).  Madeleine was not allowed parenting time with either child.

---

[1]  We employ fictitious names to protect the children's privacy.  See R. 1:38-3(d)(12).

Less than three weeks after being released from custody on conditions following her arrest, Madeleine used a key to Wally's house to take Wanda from her bed in the middle of the night and then stole Wally's truck and drove to Darcy's house to get Izzy. She was arrested after breaking into her sister's house and being subdued by Darcy's fiancé. Neither child was harmed.

Immediately after Madeleine's arrest on new charges, the Family Part judge, at the Division's request, put in place an order prohibiting Madeleine from having any contact with Wanda or Izzy. Although Wanda did not testify at the Title 9 fact-finding hearing, the judge found Wanda's "recantation [was] the more credible of [her] statements," and concluded Madeleine had emotionally abused and neglected Wanda by coaching her to make false allegations against Wally. Wally was awarded sole custody of Wanda in her parents' non-dissolution (FD) action until such time as Madeleine is released from jail, where she remains in pre-trial detention awaiting trial on kidnapping charges.

Because Wanda remains in Wally's care and custody, the guardianship case was limited to Izzy. Madeleine was placed in pre-trial detention in March 2020, just at the start of the COVID-19 pandemic, seriously delaying disposition of these cases and making the Division's provision of services to Madeleine more difficult than usual. The Division did not arrange even video

visitation between Madeleine and Izzy, however, until after being court-ordered to do so in April 2022 after the filing of the guardianship complaint. The Division thereafter provided Madeleine four ten-minute supervised video visits with Izzy ahead of the Division's bonding evaluation in August. Unsurprisingly, the psychologist conducting the evaluation found Izzy's attachment to her mother, whom she hadn't seen in over two years and didn't recognize, to be "ambivalent and insecure," and he opined she would not suffer any severe or enduring harm were her parental bond to her mother severed by court order.

By that time, however, Izzy had been removed from Darcy's care after nearly two-and-a-half years and placed with Wally, who expressed a desire to adopt her. The Division's psychologist found no secure attachment between Izzy and Wally either, but opined that theirs was a developing bond, and it was "likely that with the passage of time and all else equal in an appropriate environment" that Izzy would "form a significant and positive psychological attachment and bond" with Wally, "and then be at a significant risk of suffering severe and enduring harm if [her] relationship with [Wally] [were] then ended." The judge denied Madeleine's motion to terminate the guardianship proceeding and reinstate the FN litigation, allowing the potential

for Madeleine's reunification with Izzy, and instead terminated Madeleine's parental rights to her daughter.

We think this summary makes clear that neither of these final orders can stand. The cases are troubling because although we express no opinion on whether Madeleine coached Wanda to make false allegations against Wally, the child's uncorroborated statement that Madeleine did so cannot support an abuse and neglect finding. And while in no way minimizing Madeleine's incredibly reckless behavior in taking Wanda and Izzy in the middle of the night, the Division presented no competent evidence that either child has suffered any physical or emotional harm from the experience. The failure of the Division to provide services to Madeleine in pre-trial detention, most notably limiting her to four ten-minute video sessions with Izzy during the two-and-a-half-years Madeleine was detained and then urging the termination of her parental rights based in large measure on the lack of a secure bond between her and Izzy is simply a fundamentally unfair way for the Division to proceed in a guardianship action.

The Facts

The facts essential to resolution of these two cases are largely undisputed. Three years after Wanda was born to Madeleine and Wally in

January 2015, the two, who had never married, separated in 2018 after a long-term relationship. Madeleine, then thirty-two, took up with J.L.K. (James), living with him until the summer of 2019, when he moved out after Madeleine obtained a domestic violence restraining order against him.[2] Their daughter, Izzy, had been born in April 2019. All three adults had both criminal and substance abuse histories.

The family's history with the Division dates back to a referral lodged against Madeleine in 2015 relating to a physical altercation with one of her sisters while Madeleine was allegedly intoxicated and holding Wanda. The altercation occurred four years after Madeleine was arrested in 2011 on two charges of driving under the influence, following one after another in short succession.[3]

The Division assumed care but not custody of Wanda due to Madeleine's alleged intoxication at the time of the incident and her history of alcohol abuse. Madeleine successfully completed intensive outpatient alcohol abuse treatment with no further treatment recommended, and all of her random drug

---

[2] James, Izzy's father, died of an apparent drug overdose in early 2022.

[3] Those arrests constituted a violation of Madeleine's probation on a theft charge, resulting in her spending nearly a year in State prison.

A-2413-21

screens throughout the six months the case was open were negative.[4] The case worker expressed no concern with Madeleine's care of Wanda, as their home was always neat and clean, amply stocked with food, and the baby always appropriately dressed each time the worker visited. Wanda appeared, and collaterals confirmed, a happy and healthy baby. The Division closed its case, deeming the allegation of neglect based on inadequate supervision unsubstantiated.

In October 2018, a mandated reporter contacted the Division after receiving a report from Madeline's sister, Darcy, that Wally might be sexually abusing Wanda. The Division interviewed Madeleine, who explained she took the allegations seriously as she had been sexually abused as a child, but reported Wally was a "wonderful father," and she did not believe them. Wally, then thirty-nine-years-old, was reported to be "distraught" on hearing the allegations. He told the Division's caseworker he understood why Madeleine would be concerned given her own history of childhood sexual abuse, and both parents agreed Wanda should be examined. She was, and the case was closed as unfounded.

---

[4] Madeleine also successfully completed parole in 2015. The caseworker interviewed Madeleine's parole officer, who advised all of Madeleine's drug screens had been negative and Madeleine was "compliant with all parole requirements."

In July 2019, Wally appeared in court in the FD matter, without serving or advising Madeleine, to report his suspicion that Madeleine was using drugs while caring for Wanda.[5] The judge's clerk contacted the Division with Wally's allegation. The same day, Madeleine reported that Wanda had come home from spending a weekend with Wally complaining that he was touching her inappropriately. Madeleine recorded Wanda on her phone explaining where and how her father was touching her by making precocious sexualized gestures. The Division reported the allegations to the prosecutor's office. Wally's parenting time with Wanda was suspended in the FD case pending investigation, and the Division instituted a safety protection plan barring his contact with Wanda pending investigation.

The prosecutor's office took statements from Madeleine and Wanda.[6] Wally hired counsel and declined to be interviewed. Wanda, then four-and-a-

---

[5] Wally subsequently advised the Division's caseworker that he'd requested that hearing after Madeleine accused him of inappropriately touching Wanda over a weekend visit and threatened to block his access to the child.

[6] During Madeleine's statement, the assistant prosecutor smelled alcohol and the detective asked if Madeleine would take a breathalyzer test. Madeleine agreed, reporting she'd had a glass of wine the night before. Although she tested positive for alcohol, she was below the legal limit. The worker noted Madeleine was coherent and was not slurring her words or uncoordinated. In other words, she did not appear intoxicated. A drug screen was negative.

half, was examined by a physician at the Child Abuse Research Education and Service (CARES) Institute, who found "no acute or chronic residua as would be anticipated based on the history provided."  The doctor concluded "[t]he most significant impact for [Wanda] is psychological and has the potential for long-term negative consequences." She opined it was "important" that Wanda "be referred to a clinical mental health provider for evidence-based mental health services to assess and make treatment recommendations regarding the . . . concerns for sexual abuse by dad."[7]

Although Wanda repeated the allegations of abuse to the Division worker, the CARES doctor and a detective in the prosecutor's office, that office informed the worker the prosecutor would not bring charges against Wally after having interviewed Wally and Madeleine's mutual friend S.O. (Sean), who advised the detective that the couple had "a custody issue going on" and Madeleine "tends to use visitation against [Wally] whenever he refuses to give her money."

---

[7] The worker was subsequently advised by Wanda's therapist that she was seeing Wanda but could not treat her "as a sexually abused victim" and provide her the sort of therapy recommended by CARES because there were "no charges or substantiations."  Wally began taking Wanda to see a counselor without Madeleine's knowledge or consent after his parenting time was restored in February 2020, while the Division was investigating the claims of false reporting.

The worker thereafter interviewed Wally, who shared that he and Madeleine "used to use heroin together, way before [Wanda] was born." According to Wally, when Madeleine went to prison for eleven months for violating probation in 2011, he "got clean" and has been sober since.[8] He claimed he and Madeleine resumed their relationship on her release, although "it was not a good one" and "there was a lot of drama." Wally claimed Madeleine "could not stay sober." Three years later, they had Wanda. Wally showed the worker a video he took of Madeleine while giving her and the children a ride in July 2019, appearing to show her nodding off in the passenger seat. He reported no other incidents identifying specific concerns about Madeleine's parenting of Wanda.

As to the sexual abuse allegations, Wally claimed the charges were "strange," and that neither Wanda's school nor anyone else had reported any concerns. Wally believed Madeleine coached Wanda to make the allegations after he told Madeleine he could not continue to provide her as much financial

---

[8] Wally's mother, who was at the time supervising Madeleine's and Wally's care of Wanda pursuant to the Division's safety plan, reported to a caseworker in March 2015 that Wally had stopped using heroin in February 2014. The Division's 2015 case summary in evidence notes Wally's criminal history included drug related charges stemming from incidents in 2012 and 2013. Asked about Madeleine's drinking, Wally's mother "stated that there were issues before, but she has been doing well."

support as he had previously. Wally advised the worker he intended to seek full custody of Wanda.

The worker also interviewed Sean. Sean reported that he was a friend to both Wally and Madeleine and visited both their homes regularly, including when Wanda was present. He acknowledged "things became strained" after the couple broke up, but he had no concern for either parent and had never observed anything inappropriate in either of their homes. Sean claimed Madeleine was a good mother, and he had no reason to believe she was abusing drugs or alcohol. He acknowledged Madeleine struggled financially and could "get stressed out about finances," but that was her "only issue." He claimed he'd never witnessed "anything inappropriate" between Wally and Wanda and "would not allow something like that."

Sean told the worker that he was "confused about all of this and does not know exactly where" it's "all coming from." He claimed he saw the video Madeleine had taken of Wanda describing how Wally touched her and "something did not look right about it, and it did seem like there was some coercion going on." He continued to insist both Madeleine and Wally were good parents to Wanda. The Division closed its investigation of Wally, declaring Wanda's allegations unfounded.

A-2413-21

The Division also closed its investigation into Madeleine deeming the neglect allegation unsubstantiated. Apart from the breathalyzer results, Madeleine had not tested positive for alcohol or drugs during the four months the Division investigated Wally's allegation that Madeleine had been abusing alcohol and drugs while caring for Wanda.[9] The Division did not apply for care or custody of the children as they both appeared well-cared for and their home, even during unannounced visits, was always clean, neat and well-

---

[9] Following the Division closing its case, James, Izzy's father, was arrested for assault on Madeleine and possession of drug paraphernalia, and Madeleine obtained a domestic violence temporary restraining order against him. Although the officers responding to the scene reported to the Division that Madeleine "did not appear under the influence," the Division nevertheless requested she submit to a drug screen the following day, threatening that if she did not do so, "the situation would change" according to the case worker's notes. Madeleine did so, accompanied by Sean. The caseworker met Madeleine at the screening service, noting she did not appear to be under the influence. Although Madeleine's instant screen was negative, the sample for the "10-panel" test was rejected as "not consistent with human urine." An unannounced "10-panel" test a week later was negative. The case was open for services on Madeleine's consent only. The caseworker noted no concerns for the safety and well-being of the children in Madeleine's care at that time.

Although a finding of abuse and neglect was substantiated against James following that incident, "[t]he findings for the allegations are not established for [Madeleine]" as there was "not a preponderance of the evidence indicating that [Wanda] and [Izzy] are abused or neglected children," although there was some evidence indicating the children "were placed at risk of harm due to the confirmed [domestic violence] and [James'] syringes found in the home."

A-2413-21

stocked with food. The Division had no concerns for the children, then nearly five-years-old and seven months, continuing in Madeleine's care.

Wally regained his parenting time in the FD case in early February 2020.[10] In late February, Madeleine reported to the police and the Division that Wanda had disclosed Wally had again touched her inappropriately on an overnight visit. When interviewed by the worker, however, Wanda expressed excitement about visiting her Dad again, sharing with the worker that her father was picking her up later for a sleepover. Wanda told the worker "that things at her father's home [are] amazing and she feels happy there."

According to the worker, when he advised Madeleine that Wanda had denied being touched inappropriately by anyone, Madeleine said she couldn't

---

[10] During that hearing, the caseworker reported to the FD judge that Madeleine had refused to cooperate in a substance abuse evaluation, notwithstanding the caseworker had already been twice advised by the deputy in the FN case there was insufficient evidence against Madeleine to seek a court order requiring her to comply with the Division's recommendation for a substance abuse evaluation. The FD judge thereafter ordered Madeleine to comply with the Division's recommendations. The worker subsequently included in his notes and case summary that Madeleine had failed to comply with court orders requiring her to obtain a substance abuse evaluation, failing to mention those orders had not been entered in the FN case. Although we expect such "back-door" efforts to compel a parent's compliance with services a caseworker deems appropriate are rare, they should, of course, never occur. The Division is not exempt from the government's obligation to "turn square corners" in exercising its statutory obligations. See W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 561 (1989) (quoting F.M.C. Stores Co., v. Borough of Morris Plains, 100 N.J. 418, 426 (1985)).

understand why Wanda had recanted, and that she would not allow Wanda to go with Wally. The worker's notes reflect what he said happened next:

> [Wanda] heard what [Madeleine] stated and became upset. She began to cry and scream that her mother ruins everything and that she is mad at her for not allowing her to go to her father's home. [Wanda] stated that she had plans for the sleep over. [Madeleine] told [Wanda] to tell the worker the truth and [Wanda] exclaimed, "you know the truth" and continued to cry.

The worker contacted the local police who advised him that after speaking with Madeleine and Wanda, neither his office nor the prosecutor's office, with whom he'd been in contact, would be "taking the case."

The caseworker was later advised by his supervisor, however, that the plan was for Wally to bring Wanda to the Child Advocacy Center for a statement during his weekend parenting time. The caseworker contacted the detective Monday morning who said she had "not heard" from Wally, and "that if [Wally] does not cooperate then there is nothing that can be done on their end." The caseworker immediately contacted Wally, who advised he had Wanda with him for the weekend but that she "was upset this weekend and he did not want to put her through any more stress." After the worker "informed [Wally] of his conversation with the detective," Wally told him he was due to

pick up Wanda that afternoon and would take her to the Child Advocacy Center to meet with the detective.

During Wanda's interview with the detective that Monday, which was her second and video recorded, the detective asked Wanda if she knew why she was there, to which Wanda responded: "To talk about the news about uh, my Mom." When the detective asked what was going on with her Mom, Wanda responded that "she's just being crazy. She went to a school, and it messed her up. So, now she got mean after she went to that school, 'cause that school was dangerous. Because that school like lied to her about me and my Dad. So, then she thought that." When the detective asked what had the school lied about her Dad, Wanda replied that she didn't know, "she never told me."

When the detective asked what had Wanda's Mommy been telling her, Wanda replied in a singsong voice, "Daddy touches your crotch." The detective asked, "did that ever happen," to which Wanda replied "No. My Mommy just brought it up, 'cause she's a crazy because that school ruined her brain." When the conversation turned to good touches and bad touches, Wanda described her mother tickling her neck or her "ticklish spot" under her arms as good touches, "but touches in my pee-pee are not okay," volunteering "but my Mommy and Daddy never do that, my Mom just brought that up."

A-2413-21

16

When the detective asked Wanda whether anybody tells her "to say her pee-pee was touched," Wanda answered, "Yeah, Mommy." Asked what her Mommy tells her to say, Wanda replied "uh, tell Daddy does he touches your crotch?" Asked, "and then what happens," Wanda said "uh, then my Daddy like says to me 'That did not happen!' and then I understand it didn't happen."

Asked by the detective "has anybody ever touched you in a place that you don't like, that's not okay," Wanda replied, "uh, yeah, he, sometimes my Mommy like says my Dad touches me on my pee-pee, but he doesn't." Wanda denied her father had ever touched her on her "pee-pee" or on her "butt."

After a break, the detective returned to ask Wanda about the school that made her mother mean. The detective asked where the school was located, and what was it called. Wanda said "I, I don't know that. She never told me about her school." Asked how she knew about it, Wanda said "she only told me that she had been to a school. But she didn't tell me what kind of school it was." Asked by the detective why she thought the school made her mother "mean and crazy," Wanda replied: "Because she's been wiped out all since after she'd been to that school." When the detective asked Wanda if anyone had told her her Mom was being mean and crazy, she replied in a low voice, "Um, yeah. My Dad. But I don't really know that." Following Wanda's interview, the

A-2413-21

17

caseworker told her he observed her conversation with the detective and "commended her" for telling the truth.

Following a statement from Madeleine to the detectives in which she continued to insist that Wanda had told her that Wally had been touching her, and that she believed Wanda, Madeleine was arrested and charged with second-degree making a false report and second-degree endangering the welfare of a child. She was detained and released on conditions three days later, among them that she have no contact with Wanda unless approved by the Division or the Family court. The Division substantiated a finding of Madeleine's emotional abuse and neglect of Wanda and once again deemed the sexual abuse allegations against Wally unfounded.

Following Madeleine's arrest, the Division effected an emergency removal of the children, placing Wanda with Wally, and Izzy with a resource family. At a hearing two days later, the court upheld the removal, granted the Division custody, care and supervision of Izzy and care and supervision of Wanda, who remained in Wally's custody, and ordered Madeleine to complete a psychological evaluation and to undergo a domestic violence assessment and a substance abuse evaluation. The March 4, 2020 order provided, at the Division's request, that Madeleine was to have no contact with the children. The Division represented to the court that it would follow up with the

counselor Wally had engaged, who'd seen Wanda one time, regarding "how to proceed" with visitation between Madeleine and Wanda.

Although the Division's records reveal a lengthy conversation with Izzy's father on that date about placement, the Division's involvement and what he could expect going forward, there is no record of a similar information session with Madeleine. Madeleine was still in detention and, while present for the hearing, she claims no one spoke to her from the Division.

A week later, the Division placed Izzy with Darcy. Darcy reported that she had previously dated Wally when she was fifteen and he was eighteen. Their relationship ended when "he got aggressive with her," and she thereafter left for college. When she returned, she was shocked to find Madeleine and Wally in a relationship. Darcy reported that Madeleine claimed that "technically she was with [Wally] first since they [had] been intimate since [Madeleine] was eleven years old and [Wally] was eighteen." Darcy reported that Madeleine and Wally's "relationship was toxic" and he had once "punched [Madeleine] in her face and knocked her teeth out" requiring her to have "her teeth reconstructed."

Darcy expressed concern with Sean visiting Wally's home when Wanda was present. Darcy claimed Sean had twice tried to touch her inappropriately when she was younger. She claimed the incidents occurred when she was

sleeping, and she pushed him away and it never happened again. Darcy claimed she later learned that Sean had molested Madeleine from when she was six years old and had also molested another sister of theirs who had died in a car crash some years before. Darcy further claimed she had recently witnessed disturbing, precocious sexual behavior on Wanda's part and worried that she might be being sexually abused. A few days later, Darcy reported "inconsistency" in Madeleine's behavior, noting "sometimes she is manic and other times she's fine." The worker was unable to arrange an in-person meeting with Madeleine during this time-frame due to new COVID-19 lockdowns.

As previously mentioned, in the early morning hours of March 25, Madeleine used a key to enter Wally's home, awakened Wanda and walked her out to Wally's truck. Madeleine drove the truck to Darcy's, breaking a window to get Izzy. The noise awakened Darcy and her fiancé. Darcy carried Izzy out of harm's way before Madeleine reached her, and Darcy's fiancé subdued Madeleine with a frying pan. In an interview by a detective the following day, a very reluctant Wanda said her Mommy held her hand and walked her downstairs and outside her Daddy's house, but she wasn't scared. She also revealed her father had told her that her mother had broken a window with a metal pipe. Darcy obtained a final restraining order against Madeleine, which

A-2413-21

included protections for Izzy, which was amended on June 9, 2020, to permit visitation with Izzy as "arranged via DCPP." The criminal court granted the State's motion for Madeleine's detention.

Because of the delays and disruptions to the court system caused by the COVID-19 pandemic, the fact-finding hearing in this matter did not occur for nearly another two years. By that time, three different judges had presided over seventeen Zoom hearings and case conferences. We have no doubt the several procedural lapses in the management of this case resulted from the difficulties of adjusting to new COVID-19 protocols in the court and the jail, the difficulties of conducting discovery under the circumstances and the case having been twice handed-off to different judges.

Nevertheless, some of the lapses leading up to the factfinding hearing were serious ones. Our review of the record comes close to confirming Madeleine's charge that no representative of the Division came to see her at the jail for sixteen months following her detention in March 2020. It was actually fifteen months and several days before anyone from the Division met with Madeleine at the jail. The Division's records in evidence reflect only one telephone conversation between any representative of the Division and Madeleine during that same period.

Although the Division represented at the beginning of the case, when it requested and received an order prohibiting contact between Madeleine and her children, that it would consult with the counselor Wally had engaged for Wanda about visitation, there is nothing in the record to suggest that was ever done. Madeleine's first two motions in June and August 2020 for supervised video visitation with Wanda and Izzy were denied by the court without input from an expert that such visitation would be in anyway harmful to them. On the August motion, the Division said it wanted to wait for the results of a scheduled psychological evaluation of Madeleine.

The Division's psychological evaluation of Madeleine, which appears to be the only service the Division ever provided her before it was finally ordered in April 2022 to arrange supervised visitation between Madeleine and Izzy, was conducted via video on September 2, 2020, by the Division's psychologist, Carissa Ferguson-Thomas, Psy.D. Dr. Ferguson-Thomas summarized the purpose of the evaluation, undertaken at the Division's request, was "to provide a personality and psychological profile," and to assess Madeleine's "emotional and behavioral functioning to assist the Division" in determining "the most appropriate services for" her "at this time. Specific issues are her possible substance abuse, domestic violence and her alleged criminal behavior." The Division does not appear to have asked Dr. Ferguson-Thomas

A-2413-21

about the advisability of virtual supervised visits between Madeleine and her children.

Dr. Ferguson-Thomas conducted a clinical interview of Madeleine as well as psychological testing. She reported Madeleine "was pleasant and cooperative with the evaluation process and appeared to give her best efforts on the tasks asked of her." The doctor noted Madeleine "was alert and oriented to person, place and time," that "[h]er speech was clear, coherent, and within normal limits for all aspects (pitch, tone and rate)," and "[h]er comprehension and communication skills were consistent with her age, nearly thirty-five, and education, a high school degree and some college. Her thought processes were logical and goal-directed."

Madeleine reported in the clinical interview that she "drank heavily from twenty-three to twenty-six years-old," that is from 2009 through 2011, drinking four to five times per day several times per week when she incurred her two DUIs and was subsequently imprisoned for eleven months for violating probation. She was released on parole and completed three months of intensive outpatient treatment for alcohol abuse. She claimed her drinking problem had been under control for the past several years. Madeleine reported that she had "started using marijuana at eighteen years old, but she never smoked it consistently."

A-2413-21

Madeleine also reported a history of domestic violence with Wally and with Izzy's father, with Wanda once witnessing Izzy's father shoving her. Madeleine also reported Wanda witnessed abuse by Wally, but noted the child was very young at the time. Madeleine reported starting domestic violence counseling while incarcerated.

Dr. Ferguson-Thomas elected not to administer a cognitive test to Madeleine as the clinical interview demonstrated her intellectual functioning was within the average range. The doctor also did not administer a substance abuse screening inventory as she deemed it "clear from history as well as self-report that [Madeleine] has a Substance Use Disorder." The doctor did administer the Personality Assessment Inventory (PAI), which she described as "a 344-item instrument developed for use in the clinical assessment" of adults and "designed to provide information relevant to clinical diagnosis, treatment planning and screening for psychopathology," although "not designed to provide a comprehensive assessment of the domains of normal personality."

Dr. Ferguson-Thomas reported that Madeleine's responses to the inventory "resulted in a moderately elevated score on the infrequency scale (71T) indicating some idiosyncratic responses" to the inventory item content. The doctor also noted, however, that Madeleine "responded consistently and attended to items appropriately and did not attempt to present a more negative

A-2413-21

or more positive impression" of herself. Dr. Ferguson-Thomas also noted Madeleine's responses "indicated a moderate elevation" (T-Score 60 to 69) on the "Alcohol problems" subscale "and the interpersonal scale of Warmth indicating she is warm, sympathetic and supportive towards others." The doctor noted Madeleine "did not receive clinically significant elevations on any of the treatment consideration scales which identify potential complications in treatment."

Dr. Ferguson-Thomas concluded Madeleine was a woman of average intelligence with a substance use disorder she reported to be in full-remission, who "does not seem to take responsibility for anything that has transpired, as she speaks about the events that led to her incarceration as events that just happened to her instead of as actions she decided to take." Although reporting that Madeleine "does not appear to be suffering from a mental health disorder, the doctor noted Madeleine's actions indicate problems with her insight and judgment that need to be addressed."

"To that end," the doctor "recommended that [Madeleine] participate[] in individual therapy," which "should also further explore and address her anxiety symptoms and process [her] current situation." Finally, Dr. Ferguson-Thomas concluded that "[a]lthough the PAI did not reveal a specific personality disorder, [Madeleine's] previous behaviors along with her report of a history of

interpersonal dysfunction and lack of impulse control indicate the possibility of such a disorder," which "should be explored in therapy through continued assessment."

In addition to her psychological evaluation, Madeleine completed her court-ordered drug evaluation in detention, where she engaged in substance abuse treatment and domestic violence classes on her own initiative with no assistance from the Division. The Division never provided the therapy recommended for Madeleine and continued to oppose any visitation, as did the children's law guardian. Beginning in November 2020, the court's multipurpose orders included the statement that Madeleine's "contact with [the] minors is suspended pending investigation by the Division," although no "investigation" appears to have ever occurred. Madeleine renewed her motion for supervised video visitation in March 2021. In accord with the Division's request, the judge agreed to hear her motion at a subsequent hearing. The motion, however, was never heard or decided.

The Title 9 factfinding hearing and decision

Another major procedural lapse in the handling of this matter was the Division's use of the events of March 25, 2020, when Madeleine took Wanda from Wally's home and tried to take Izzy from Darcy's home, to prove its

claim of abuse and neglect against Madeleine without amending its Title 9 complaint to include those events, which had occurred after the Division filed its complaint for custody, care and supervision. The judge presiding over the fact-finding hearing, the third judge assigned and new to the case, began the proceeding by stating she saw nothing in the complaint or in any prior order that would allow the Division to include the kidnapping allegations in its case.

Counsel for the Division explained the lawyers had discussed the issue at length before one of the prior judges, that no one had demanded the Division file an amended complaint, and "[i]t didn't seem necessary to amend the complaint." Counsel argued that a Title 9 fact finding is a de novo hearing in which the Division can "present all evidence that supports a Title 9" finding, and that the facts surrounding Wanda's alleged kidnapping were "extremely relevant to the circumstances and what [she] has experienced." In addition, counsel claimed that pursuant to N.J.S.A. 9:6-8.50(b), the court could amend the allegations to conform to the proofs at the factfinding hearing. Trial counsel for Madeleine agreed that there had been a discussion on the record during which the defense had contested the ability of the Division to include the events giving rise to the kidnapping charges without amending the complaint; "[a] ruling was made and here we are."

When the judge attempted to clarify with the deputy that she was representing "that [at] a prior court hearing that another judge . . . in relying on [N.J.S.A.] 9:6-8.50(b) said that you could . . . present evidence about the alleged kidnapping" without amending the complaint, the deputy responded that she wasn't "sure if that formal finding was placed on the record under that statute." She insisted, however, "that that was the intention and we would be asking to conform at the end of the trial to prove to what's been presented. And, that [the] Title 9 statute section allows us to do that without formally amending the complaint." Following that colloquy, the judge permitted the Division to present evidence on the alleged kidnapping based on the representations of both counsel.[11]

---

[11] We do not fault the trial judge for proceeding based on the representations of the lawyers. They were, however, not accurate. There had been a discussion on the record before another judge at a September 28, 2021 case management conference about the issue. Counsel for Madeleine had objected to matters that were not part of the Division's substantiation of the abuse and neglect finding against her, and specifically letters Madeleine had written to the criminal presiding judge, coming in at the factfinding hearing. Counsel for the Division countered with "a totality of the circumstances argument," contending that "all of the information is relevant" and that "the court needs to hear all of the information that the Division has indicating that it's Title 9 finding is appropriate."

The judge did not resolve the question, instead stating he would deal with the defense objections and "all the discovery and evidentiary issues" at the next case management conference. Although the issue was again discussed

The Division presented three witnesses at the factfinding hearing, which took place over three days in January and February of 2022: the "clinician" Wally had arranged for Wanda to meet with, the detective that took the two statements from Wanda, and the caseworker. The clinician, Rachel E. Borowiec, MS, LPC, provided a letter to Wally dated March 10, 2021, confirming that Wanda had "been receiving services with A Better Tomorrow Counseling Services since February 8, 2021," and had "attended 4 total sessions." The letter, which was marked in evidence, stated that Wanda and Wally have been "actively engaged in services" and although Wanda, [then aged six] was "in the early stages of therapy and has just begun to establish rapport and begin to explore her thoughts and feelings related to early childhood trauma, . . . [she] has expressed fears related to having any

---

at the next case management conference in November, the judge never heard argument or decided the issue. We note our disagreement with counsel for the Division that N.J.S.A. 9:6-8.50(b) was designed to permit the Division to proceed on allegations known to it months and years in advance without amendment of the Title 9 complaint. The rule to allow a motion at trial to amend the pleadings to conform to the proofs was not designed to permit a plaintiff to proceed on unpleaded claims. See Sattelberger v. Telep, 14 N.J. 353, 363 (1954) (explaining that "[p]leading in civil actions is the means of raising issues for adjudication; and where, as here, there is not even the semblance of a cause of action pleaded against a particular defendant, there is no issue for determination and no basis for judgment against him, unless the parties waive formal pleading of operative facts and by consent submit an issue to the court for determination").

interaction with her biological mother, whom [Wanda] has identified as a source of her distress and emotional dysregulation, at this time."

At the factfinding hearing, Borowiec testified she was neither a psychologist nor a psychiatrist but a licensed professional counselor through the New Jersey State Marriage and Family Counselors. She explained that Wally initiated the contact with "A Better Tomorrow" and she'd never spoken with anyone from the Division. She had, however, spoken to the deputy in advance of her testimony. She had never seen the CARES report or the audio or videotapes of Wanda. She testified she could not make a psychological diagnosis and was not appearing as an expert witness.

Borowiec testified that she learned from Wally that Wanda was "having some mental and emotional health concerns related to an incident regarding her mother," which Wally had described as a kidnapping, and Wanda "referred to as Mommy coming and taking me in the middle of the night," as well as Wanda's "own thoughts and feelings regarding her mother's incarceration" and Wanda's "kind of feelings of guilt related to it." Borowiec testified Wanda exhibited "emotional dysregulation" as it related to her mother, which Borowiec characterized as "[p]roblems with focus, attention, and concentration, nervousness, difficulty staying on task."

Borowiec also testified that Wanda had also "indicate[d] that she had made [sexual abuse] allegations [regarding her father] and she felt that her mother had informed her to make those allegations or [Wanda] would not be able to have contact with her mother."  According to Borowiec, Wanda indicated that "my mother told me that she would go away for a long time if I didn't say that against Daddy."  Borowiec claimed that through the therapy Wanda "has been able to again talk about her mother" and while "certainly indicat[ing] you know sadness or different emotions related to her mother's incarceration, . . . [she] is also able to talk about that without showing emotional dysregulation."

The Division also presented the detective who twice interviewed Wanda, who testified about those interviews and the investigation she and her office undertook into this matter.  The detective described Wanda's first statement that her father had touched her inappropriately and the investigation that followed.  The detective testified the video Madeleine had previously made of Wanda describing how Wally was touching her was not the same as the touching Wanda described to the detective, and that after interviewing Sean and presenting the evidence to her section chief, the decision was made not to pursue the matter.

31

The detective's second interview of Wanda was played for the court during the detective's direct examination. The detective also testified to her interview of Madeleine that followed directly after Wanda's second interview. The detective described Madeleine's upset when the detective told her Wanda had recanted the allegations against her father, claiming Wally had "put that information in her head." The detective testified she remembered "saying, well then I could say the same thing to you. Because when you brought her in the first time, she said the opposite." The detective testified that Madeleine "believed that this happened, and that it was because [Wally] brought her in that [Wanda] said that."

On cross-examination, the detective conceded she'd never interviewed Wally because he wouldn't speak with her, nor the persons Madeleine had identified who'd also heard Wanda's allegations against Wally. The detective testified that after Wanda's two interviews, her office did not pursue charges against Wally.

The Division's last witness was the caseworker. He testified about his interactions with the family in 2019 and 2020, and particularly the day in late February 2020 when Madeleine refused to allow Wanda to go with Wally and the worker heard Wanda cry and say to her mother that she "ruins everything," and the steps he took afterward to have Wanda again interviewed by the

prosecutor's office. He recounted sitting with Wanda after her second interview while the detectives were interviewing Madeleine. The caseworker testified that Wanda was "excited and hyper," and "it was kind of all over the place. But she . . . said she told the truth, and I commended her."

Following the caseworker's testimony, the Division rested subject to the admission of the letters Madeleine had allegedly written to the criminal judge in which she admitted taking the children, explaining her reasons for doing so, as to which there had been no testimony. Counsel for Madeleine objected, asserting the Division had failed to lay any foundation for their admission. The deputy asserted that defense counsel "previously advised he had no objection for them, so I thought" when the judge broke in to say, "That's what I thought. You . . . didn't object before. So [the letters] are in."[12]

Madeleine testified in her own behalf about the allegations Wanda had made about Wally and her efforts to get the Division and the prosecutor's office to believe her daughter. She explained how she recorded the child's

_____

[12] The deputy was apparently referring to the earlier discussion on the record about the Division including evidence relating to the alleged kidnapping without having amended its complaint. Our review of the record reveals no prior discussion about the admission of Madeleine's letters to the criminal judge. Because, the judge did not rely on the letters to support her finding of abuse and neglect, and the Division never established in any event the emotional harm it alleges the children suffered from Madeleine's actions, we do not consider the issue further.

statements on her phone and sent them to her mother and her aunt on Facebook Messenger. Madeleine also testified that she'd told the caseworker as well as the prosecutor's office that her roommate and her aunt had both heard Wanda say that Wally had touched her inappropriately. According to Madeleine, Wanda had said the same thing to the doctor who examined her at CARES in 2019, whose report was admitted for the limited purpose of the child's statements, and only recanted her allegations after she began spending time with Wally again in February 2020.

After a colloquy with the judge and a discussion between defense counsel and Madeleine, defense counsel advised the court that he would not be asking Madeleine any questions about the night she took Wanda from Wally's house, and the court ruled cross-examination would be limited to the scope of the direct. Madeleine ended her testimony by describing the clothes and toys she claimed Wally was lavishing on Wanda when she resumed parenting time with him in February 2020, and how the therapist Madeleine had taken Wanda to in 2019 explained that the Division's failure to substantiate the allegations against Wally meant the therapist could not provide Wanda the evidence-based therapy that CARES had recommended to assess and make treatment recommendations about the concern for the child having been sexually abused by her father.

On cross-examination, the deputy homed in on the video Madeleine had taken of Wanda and her posting it on the internet. Madeleine denied posting it intentionally on the internet but admitted she'd sent it via Facebook Messenger to her family. She acknowledged that the caseworker had asked whether she'd posted the video on the internet, telling him "that if it went up that . . . it was a mistake and I took it right down."

Madeleine's former roommate and her aunt both testified to statements they'd heard Wanda make accusing Wally of touching her inappropriately. Madeleine's roommate also testified about the child's behavioral changes during the time she had parenting time with Wally.

In his closing argument, defense counsel contended the picture that emerged from the factfinding hearing was that "the Prosecutor was depending on the Division to investigate this thoroughly to protect [Wanda]," and "[t]he Division was depending on the Prosecutor to investigate thoroughly and protect [Wanda]," but neither agency actually did so. Counsel maintained that neither the Division nor the Prosecutor's Office had ever conducted any real investigation into whether Wally had abused Wanda. Counsel insisted the record did not provide an answer to that question, and without it there could be no answer as to whether Madeleine had coached Wanda to make a false report. He argued that all the record provided were the various videos of Wanda's

initial disclosure in July 2019 and her alleged recantation in March 2020, "and really no way to choose between what version of the facts is correct."

Defense counsel argued that Wally's renewed access to Wanda beginning in February made the timing of the child's claims that her mother had coached her to make false allegations against her father suspicious. Counsel also focused on Wanda's second statement to the detective in which the child not only reported that her father told Wanda her mother was "mean and crazy," but also that her father explained to Wanda that what her mother was telling her to say, never happened — quoting the child's statement to the detective that "Daddy says 'That did not happen!' and then I understand it didn't happen." Counsel noted the detective failed to follow up on the child's statements about what her father had told her, and that neither her office nor the Division seemed to take any notice that Wally had obviously influenced Wanda's second statement to the detective.

Counsel for the Division and the law guardian focused on the threat of harm to Wanda. The law guardian focused on Madeleine having "repeatedly caused [Wanda] to undergo sexual abuse evaluations and interrogations despite the allegations not being true." The law guardian also focused on the detective's second interview of Wanda, arguing the child had been "clear that the allegations of sexual abuse were not true," and that Wanda "was candid in

saying that 'Mommy says daddy touches your crotch, but it did not happen.'" The deputy touched on those same points, adding Borowiec's observations of the emotional difficulties Wanda was experiencing when she entered therapy and Borowiec's opinion "that [Wanda's] source of emotional dysregulation actually stems from [Madeleine]."

In response to defense counsel's argument that no real investigation was undertaken by either the prosecutor or the Division, the deputy argued that what was "being missed is that information that's being assessed by the Prosecutor's office and the Division it's not just the information being provided by [Madeleine], it's got information being provided by [Wanda], and [the agencies'] observations, having extensive experience in this field and dealing with other investigations of this nature." The deputy also relied on Madeleine's letters to the criminal presiding judge admitting she took Wanda from Wally's house and used a crowbar from his truck to break a window in her sister's house in an effort to get Izzy. The deputy contended the Division had not only established that Madeleine put Wanda at risk of substantial physical harm by taking her from Wally's in the middle of the night but also that Wanda "still goes to counseling to this day to deal with some of the issues" arising from that event.

After hearing the testimony and the arguments of counsel, the judge found Madeleine "coached minor [Wanda] to make sexual abuse allegations on her father, [Wally]" qualifying her as an abused and neglected child pursuant to N.J.S.A. 9:6-8.21(c)(4)(b). After reviewing the law and summarizing the testimony of the witnesses, all of whom, with the exception of Madeleine, the judge found credible, the judge focused on Madeleine's testimony, Wanda's statements, and Borowiec's opinion in explaining her reasons for finding the Division had carried its burden.

Specifically, the judge found Madeleine's "judgment is so clouded that she is not a credible witness." The judge found Madeleine's testimony was "skewed to benefit herself; she wants to be believed; she wants people to believe that this happened to [Wanda]." The judge specifically found Madeleine's judgment was "clouded in the steps she took when [Wanda] disclosed," focusing particularly on her decision to post "the videos on social media on — on whatever shared — shared app," which the judge found "odd . . . and show[ed] poor judgment."

The judge was convinced Madeleine "believes her child, that this happened to her." The judge further stated "and it may have happened. I'm not here to say whether or not the child was sexually assaulted or not." She concluded, however, "that everything that [Madeleine] has done is in her quest

38

to be heard and in hav[ing] her child be heard, and it has clouded her judgment and in my opinion thus affected her credibility."

The judge found Wanda was an abused and neglected child under the last clause of N.J.S.A. 9:6-8.21(c)(4)(b) defining an abused or neglected child as one

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; <u>or by any other acts of a similarly serious nature requiring the aid of the court</u>.
>
> [Emphasis added.]

The judge concluded that Madeleine's actions in having Wanda "say she was sexually abused when . . . it is clear that the child told the detective . . . that that was not true and that her mother made her say that . . . is . . . where the proof lies." The judge further found based on the testimony of the counselor "Borowiec, where she testified about the emotional dysregulation that the child has experienced . . . that that is the emotional harm that this child has experienced because of these allegations that she first said, and then she recanted on those."

A-2413-21

The judge found Wanda "was most consistent" to the detective, to the caseworker, and to "Borowiec that her mother made her say things, and that the child is feeling the effects of that because of the emotional dysregulation she has experienced, also caused by the kidnapping, as testified to by . . . Borowiec." Finally, the judge concluded "that [Wanda's] recantation is the more credible of the statements by the child. And also, because clearly all . . . that [Wanda] has been through with her mom has caused her to be emotionally distressed."

The controlling law and our analysis of the court's abuse and neglect finding

Our standard of review is well established. "To the extent" the issues on appeal "concern a trial court's findings of fact or credibility determinations, we accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). No similar deference, however, is accorded the judge's legal conclusions, which we review de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

We have no quarrel with the judge's findings of fact or her determinations of the credibility of the witnesses who testified. Two fatal errors of law, however, require reversal of the abuse and neglect finding against Madeleine: first, without hearing Wanda testify, and with no evidence of corroboration offered by the Division, the judge found Wanda's "recantation is the more credible of the statements by the child"; and second, the judge concluded without expert testimony that the "emotional dysregulation" Borowiec testified the child had suffered was "caused" by "all . . . that [Wanda] has been through with her Mom," both the coaching and the kidnapping. Neither of those findings can stand under long settled case law and without them neither can the judgment.

The Division bears the burden of proof at a factfinding hearing to establish present or future harm to a child by a preponderance of the "competent, material and relevant" evidence. N.J.S.A. 9:6-8.46(b); <u>N.J. Div. of Child Prot. & Permanency v. A.D.</u>, 455 N.J. Super. 144, 155-56 (App. Div. 2018). It is axiomatic that a court may not make a determination about a witness's credibility without hearing the witness testify. See <u>N.J. Div. of Youth & Fam. Servs. v. L.A.</u>, 357 N.J. Super. 155, 168-169 (App. Div. 2003) (noting a trial judge's finding that a child was a credible witness without hearing from her was "pure speculation"). Although Title 9 contains a specific

hearsay exception allowing prior out-of-court "statements made by the child relating to any allegations of abuse or neglect" to be admitted at the factfinding hearing, the statute is unequivocal in providing "that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4); N.J. Div. of Child Prot. & Permanency v. T.U.B., 450 N.J. Super. 210, 228-34 (App. Div. 2017) (tracing the history of Title 9's hearsay exception).

Notwithstanding the judge's acknowledgement that the sexual abuse Madeleine contends Wanda suffered "may have happened," and that she was "not here to say whether or not the child was sexually assaulted," the judge found Madeleine had coached Wanda to make false allegations of sexual abuse against her father based only on Wanda's uncorroborated, out-of-court statements that the allegations were "not true and that her mother made her say that."

The judge found Wanda's "recantation is the more credible of the statements by the child," based on her view that Wanda "was most consistent" to the detective, to the caseworker, and to "Borowiec that her mother made her say things" against her father that were untrue. The case law, however, is clear that consistency is no substitute for the statutorily required corroboration of a child's out-of-court statement. See A.D., 455 N.J. Super. at 157 ("the mere

repetition and consistency of [a child's out-of-court] statements are insufficient to support a finding of corroboration under N.J.S.A. 9:6-8.46(a)(4)"); N.B., 452 N.J. Super. at 523 (noting "consistency alone does not constitute corroboration").

Because an abuse or neglect proceeding implicates a parent's substantial rights, "it is of great importance that the evidence upon which judgment is based be as reliable as the circumstances permit." In re Cope, 106 N.J. Super. 336, 343 (App. Div. 1969). "By its nature, corroborative evidence 'need only provide support for the out-of-court statements.'" L.A., 357 N.J. Super. at 166 (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App.Div.2002)). But "[s]ome direct or circumstantial evidence beyond the child's statement itself is required." N.B., 452 N.J. Super. at 522.

The Division, however, did not offer anything to corroborate Wanda's statements that Madeleine coached her to falsely accuse her father. Corroboration is nowhere mentioned in the trial judge's factfinding decision and neither the Division nor the law guardian addresses it in their briefs to this court.[13] Because Wanda's out-of-court statements that her mother coached her

---

[13] At oral argument, the Division contended Wanda's crying when Madeleine wouldn't let her go with Wally and her statement that Madeleine "ruin[s] everything" and that she "knew the truth" corroborated Wanda's statements

to make sexual abuse allegations against her father that were not true are without corroboration in the record, they cannot support an abuse or neglect finding against Madeleine. N.J.S.A. 9:6-8.46(a)(4).

To the extent the trial judge relied on Borowiec's testimony to find the "emotional dysregulation" Wanda was experiencing was as a result of or caused by Madeleine coaching her to make false allegations against Wally, or "the kidnapping," the judge erred. Although we have acknowledged that "psychological evidence of emotional effects . . . are routinely admitted in Title Nine cases," N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015), "as substantive evidence" that may indirectly corroborate a child's out-of-court statements, Z.P.R., 351 N.J. Super. at 439, or establish a child has suffered emotional harm at the hands of a parent, N.J. Div. of Youth & Fam. Servs. v. S.S., 372 N.J. Super. 13, 22-23 (App. Div. 2004); that was not the testimony Borowiec offered here.

---

that Madeleine coached her to lie. A child cannot corroborate her own statements with additional statements. Repetition does not equate to corroboration. See A.D., 455 N.J. Super. at 157. The law guardian contended no corroboration was necessary for Wanda's recantation because "that's not accusing anyone of anything." Besides not being briefed, the argument is obviously without merit given the Division's allegations against Madeleine in this matter. It requires no discussion here. See R. 2:11-3(e)(1)(E).

Borowiec is not a professional consultant of the Division retained to conduct a psychosocial evaluation of Wanda. Borowiec is not a psychologist. She could not offer the sort of "psychological evidence of emotional effects" routinely admitted in these cases, because she is not an expert and is unqualified to do so. Borowiec is a marriage and family counselor retained by Wally nearly a year after the events that gave rise to this case.

The court admitted a letter from Borowiec from March 2021, stating that Wanda then aged six, was "begin[ning] to explore her thoughts and feelings related to early childhood trauma, but has expressed fears related to having any interaction with her biological mother, whom [Wanda] has identified as a source of her distress and emotional dysregulation, at this time." At the factfinding hearing, Borowiec testified that Wanda began "receiving services due to having some mental and emotional health concerns," which her father related to an "incident of kidnapping" by Wanda's mother. According to Borowiec, Wanda told her that her "Mommy came and took her in the middle of the night," and she reported "having nightmares following that incident and indicating being nervous to leave her room or go anywhere without confirming her father's whereabouts."

We have recognized that a psychologist's ability to link a "child's symptoms, and especially her nightmares," to alleged abuse as opposed to

some other cause is "an important and legitimate area of inquiry" for a judge to explore with a testifying psychologist, as it will often be critical to determining whether the nightmares could serve to corroborate an allegation of abuse. I.B., 441 N.J. Super. at 597. It is obviously not an appropriate topic for lay opinion, much less the hearsay statement of a six-year-old who has purportedly identified her mother as the "source of her distress and emotional dysregulation." See N.B., 452 N.J. Super. at 522 (explaining that even if a child's hearsay statements to a psychologist could be considered reliable, "[o]ur courts have rejected the concept that mental health professionals may opine about the trustworthiness of a child's hearsay statements" (quoting State v. J.Q., 130 N.J. 554, 582-83 (1992))).[14]

---

[14] We do not think a finding about even the reliability of the child's statements to Borowiec, or anyone else, could be made here without considering whether Wanda was subjected to "undue suggestiveness" by "a lack of control for outside influences on the child's statements, such as previous conversations with parents" or others. State v. Michaels, 136 N.J. 299, 309 (1994). As already noted, Wanda told the detective during her second interview that her father had said her mother was "mean and crazy," and that what her mother was telling her to say never happened; "Daddy says 'That did not happen!' and then I understand it didn't happen." Although the detective did not take note of those statements, the Division did, characterizing the latter in its brief as Wally "help[ing] [Wanda] understand the allegation her mother had made was not true." In a similar vein, the trial judge mentioned in her opinion from the bench that following that second interview, the caseworker commended Wanda "for finally . . . telling the truth to [the] Detective . . . that the allegations of sexual assault really were not true and that the mother had prompted her to say that."

Because Borowiec did not testify as an expert and was unqualified to render an opinion linking Wanda's "emotional dysregulation" to Madeleine's alleged coaching of Wanda to make false allegations against Wally or to taking her from Wally's home in the middle of the night, the judge erred in relying on Borowiec's testimony to corroborate Wanda's statements that Madeleine coached her to falsely accuse her father or to find she suffered any emotional harm from Madeleine's conduct. As the Division failed to offer any corroboration of Wanda's statements that her mother coached her to falsely accuse her father or any proof that the child has suffered emotional harm, the trial court's finding that Madeleine abused and neglected Wanda is not supported by substantial credible evidence in the record and must be reversed.

The Guardianship Action and the judge's decision to terminate parental rights

In the last case conference in the abuse and neglect matter in early March 2022, following the filing of the guardianship complaint, Madeleine, on her own behalf, again raised the failure of the Division to provide her visitation with her children. She told the judge that the initial order to show cause in the case from March 2020, stated she was allowed "[supervised] visitation with my children. But then it also said at the end that I could not in the same order."

Madeleine claimed after that, the orders said she couldn't have visitation with her children "pending a Division investigation." According to Madeleine, then "[t]hey said if I took a psych eval I could have visits. And I took the eval and I did not get the Zoom visits." She went on to say that the language in the orders changed again after a Division supervisor visited her in July 2021, and told her "it's not us keeping you from your kids it's the prosecutor." Madeleine claimed after that encounter, the FN orders included language that her visitation was suspended pending the prosecutor's investigation, although no proof of any ongoing investigation by the prosecutor's office had been produced by the Division.

A review of the orders and the transcripts of the hearings in the abuse and neglect matter at which they were entered largely confirms those claims. The order to show cause entered March 4, 2020, states both that Madeleine is allowed visitation on a twice weekly, two-hour basis, supervised by the Division or a Division approved supervisor, and also that she "shall have no contact with the minor children at this time." At the hearing for the application of the order to show cause, the Division asked that Madeleine have no contact with her children, given the nature of the allegations and Wanda having just starting therapy, pending the receipt of a recommendation from Wanda's treating therapist, which the Division represented it intended to

request. As already noted, there is nothing in the Division's case record in evidence suggesting the Division pursued any such recommendation.

At the case management conference on June 9, 2020, Madeleine asked about the no contact order preventing her from seeing her children. As the judge started to explain that "it's probably not a no contact, there's probably restrictions. You probably have parenting time and visitations permitted," the deputy broke in to say the Division had requested the no contact provision at the inception of the case, hoping "to set up a psychological evaluation before we proceeded with that contact." The deputy was doubtful she could arrange a psychological evaluation for Madeleine at the jail in light of the COVID-19 restrictions, but added that were Madeleine released, "contact might be video and that might be something the Division can reassess upon her release."

The judge denied Madeleine's request for visitation, ruling the no contact provision would remain until Madeleine was released, at which time her counsel could make an application "to reassess any contact." Wally objected to Madeleine being reassessed on release. The judge explained "the law require[d]" him to "explore[] [a] form of parenting time" because of the "presumption that the biological parents have contact with their children even under very challenging situations . . . and it's the law based upon the fact that the children have a right to have contact with their biological parent." The

June 9, 2020 order continued to provide that Madeleine's "visitation is suspended until further ordered."

At the next case management conference on August 21, 2020, counsel for Madeleine advocated the Division start virtual supervised visitation between her and her children. The Division opposed, with the deputy stating that although she "normally . . . would agree . . . about the importance of visitation," the substantiated false allegations against Wally resulting in the removal and Madeleine's subsequent detention on kidnapping charges was "a unique situation." The deputy contended "under those circumstances, we have to really be careful, when we start these visitations again. There may [be a] need [for] the involvement of a professional therapist to be involved in those visits." The deputy noted the Division had a psychological evaluation for Madeleine set up, which would enable the Division "to get some input." The judge again denied Madeleine's request for supervised visitation, allowing her to "bring the issue back" on short notice. The order from the August 21 case management conference stated that Madeleine "is not permitted to have virtual visits with the minor children at this time."

Madeleine could not participate in the next case management conference on November 10, 2020, although her counsel was present. The Division acknowledged Madeleine had completed both her psychological evaluation and

a substance abuse evaluation in detention, that substance abuse and therapy had been recommended and that she would "be able to receive some of those [services] in the jail." The issue of visitation was not discussed. Notwithstanding the deputy's representations that Madeleine had completed a psychological evaluation, the order entered November 10 continued to state that Madeleine "shall complete a psychological evaluation," and that Madeleine's contact with Wanda and Izzy "is suspended pending investigation by the Division."

The next case management conference was conducted on March 1, 2021. Madeleine had new counsel who advocated for video visitation between Madeleine and both Wanda and Izzy. The Division, the law guardian and Wally all opposed, arguing that Wanda had just started therapy, for the second time, was beginning to explore her feelings about Madeleine taking her from Wally's home in the middle of the night, and that the Division needed "to have a professional recommendation before [it] even [did] any type of video visitation." Both the Division and the law guardian also opposed any visitation between Madeleine and Izzy pending the Division's ability "to make a proper assessment of that as well."

Although agreeing with Madeleine's lawyer that Madeleine had "a right to have some visitation and some contact with her children, notwithstanding

her current situation," the judge ruled that "[t]he current visitation order will stand," and that he would address it at the next conference. The March 1, 2021 order provided that Madeleine would attend substance abuse treatment, which the deputy previously represented should be available through the jail, and that Madeleine would also attend individual counseling and a domestic violence assessment, both as arranged by the Division. The order also provided that Madeleine's contact with Wanda and Izzy, including visual visitation, is suspended "pending investigation by the Division."

As already noted, visitation was not addressed at the next conference on April 12, 2021. Instead, the deputy reported that Madeleine had completed her psychological evaluation in detention, not mentioning the evaluation had occurred seven months before, and that the Division was "waiting on her release to set up the recommended services," although there was no indication that Madeleine's release was imminent. The April 12 order stated in accordance with the deputy's representation that Madeleine "completed a psychological while incarcerated. Division to set up recommended services upon her release from jail," and that her contact with the children was "suspended including virtual visitation pending investigation by the Division."

The court was not able to make contact with Madeleine at the jail for the permanency hearing on May 24, 2021. The issue of visitation was not raised.

The deputy acknowledged that Madeleine, in addition to completing her psychological evaluation, had also completed her substance abuse assessment and would be able to complete her recommended level III treatment in detention. The deputy, however, noted the Division's psychologist had also recommended therapy and domestic violence services that the deputy, without explanation, represented would need to be completed on Madeleine's release.

Although the deputy was seeking an extension in the permanency plan for Izzy because the fact-finding hearing in the abuse and neglect case had not been held, she represented that the Division anticipated "this case is going to move towards termination of parental rights followed by adoption" for Izzy and thus was looking to establish a date for the factfinding hearing. The law guardian echoed the deputy's concerns, stating she was aware that procedurally, the court had "to move forward with the fact-finding before we can get to the guardianship stage" for Izzy.[15] She noted, however that Izzy was

_____

[15] But see N.J.S.A. 30:4C-15(c) (permitting the filing of a guardianship complaint whenever "it appears that the best interests of any child under the care or custody of the division require that he be placed under guardianship"); N.J. Div. of Youth & Fam. Servs. v. A.P., 408 N.J. Super. 252, 259 (App. Div. 2009) (holding "except for a guardianship action under N.J.S.A. 30:4C-15(a) based on a finding of abuse or neglect under Title 9, [DCPP] may bring an action for the termination of parental rights under any of the other subsections of N.J.S.A. 30:4C-15 without first bringing an action under Title 9").

"now two years old, and she really is bonding with her aunt and uncle" and "we want to make sure we can give her some sense of permanency and stability."

The May 24 permanency order noted that services for Madeleine remained outstanding, specifically that she was to comply with substance abuse treatment while in detention. The order also included the court's approval of the three-month extension of the permanency plan for Izzy, with a goal of reunification, notwithstanding the comments of the deputy and the law guardian, and that Madeleine's contact with Izzy remained suspended pending further order of the court.

As Madeleine advised the judge at the previous hearing in the abuse and neglect case, the language of the order regarding her visitation changed in August 2021, after Madeleine had received her first visit from a Division caseworker the prior month. At the permanency hearing on August 20, 2021, before a new judge, Madeleine advised the court that although the orders had for months provided that visitation remained "suspended pending a Division investigation," the caseworker had explained during her July visit that "it was

not the Division that was keeping the no contact order on me; that it was the Prosecutor's Office."[16]

The deputy confirmed to the court that the worker's statement was correct, without reference to any criminal court order, and the August 20, 2021 case management order recited that Madeleine's "contact with minors is suspended including virtual visitation pending investigation by the Camden County Prosecutor's Office." That language continued to be included in every case management and disposition order through the factfinding hearing.

In the last hearing in the abuse and neglect matter held on March 2, 2022, Madeleine, after setting out that history, argued that even if it were true that the prosecutor had an open investigation, "it would still be . . . deferred to

---

[16] The caseworker's notes of the meeting with her supervisor and Madeleine at the jail state that in response to Madeleine's question about visitation, the caseworker "explained there is a priority 4 in place from the Prosecutor" since the kidnapping. When Madeleine asked why she was "not allowed to see [Wanda and Izzy] after she came out of jail on 3/4/2020," the "[s]upervisor explained it was due to the charges of false reporting and child endangerment." In response to Madeleine's question of why Izzy was included in the no contact order at that time, the "[s]upervisor explained child endangerment would apply to all children in her care." As already noted, the pretrial release order in the Criminal Part entered March 5, 2020, provided only that Madeleine "[m]ust abide by all DCPP and Family court orders and recommendations. In addition, defendant is to have no contact with the alleged victim [presumably meaning Wanda] unless approved by DCPP or Family Court." The only other order from the Criminal Part in the record on appeal is the subsequent detention order, which is silent as to visitation.

the Family Part to make [the] determination on whether or not I could visit with my children."[17]  After hearing from Madeleine, the judge noted she had not reviewed the criminal file but would have to believe that "technically the investigation is completed," and deleted the language that "contact with minors is suspended including virtual visitation pending investigation by the Camden County Prosecutor's Office" from the first order entered in the guardianship proceeding.  The March 2, 2022 guardianship order provided only that Madeleine's visitation was "temporarily suspended pending further order of the court."

At the first hearing in the guardianship matter the following month, a different deputy representing the Division told a different judge that there were no services being provided to Izzy, as an early intervention assessment found her "developmentally on target."  The deputy explained there was no visitation in place as there was a final restraining order preventing contact between Madeleine and Izzy.[18]  The new deputy further represented, directly

---

[17]  Madeleine was generally correct.  See Administrative Directive #1-10 and Administrative Directive #1-10 Supplement; Fall & Romanowski, Current N.J. Family Law, Child Custody, Protection and Support § 32:7-2 (2024) "Situations Involving No-Contact Orders."

[18]  That, of course, was not true.  The deputy was referring to, and later quoted from, the temporary restraining order entered on March 25, 2020.  The final

contradicting what the prior deputy had told the prior judge, that although there were criminal charges pending, it was the deputy's "understanding there aren't any restrictions [on Madeleine's visitation] in the [criminal] court order at this time," adding "but that might be changing in the future."[19]

The deputy also advised the court the Division did not intend to order a psychological evaluation for Izzy, and "[g]iven the circumstances in the case," the Division did not "intend to get a bonding evaluation" as there "has not been visitation for two years now, and [Madeleine] remains incarcerated."  The law guardian echoed the deputy's request that the final restraining order prohibiting visitation remain in place and likewise advised she would not be seeking any evaluations on Izzy's behalf.

Madeleine's new counsel argued that Madeleine had rights to visitation that were being violated; that he wished to know what the deputy was referring to with regard to a change in the criminal court order to limit contact, and that

---

restraining order entered on May 20, 2020, specifically permitted visitation between Madeleine and Izzy as "arranged via DCPP."

[19]  The genesis of the deputy's comment appears to have been a March 9, 2022 discussion between the caseworker and Darcy.  The caseworker's notes from that conversation state the two "discussed that the contact person at the Prosecutor's office is R[]M[] who is handling the request for a court order reflecting what is in the [restraining order], as visitation or child contact was not addressed in the criminal court orders and [the caseworker] [had] requested this be clarified."

A-2413-21

the Camden County Correctional Facility could provide the video visitation to which Madeleine was entitled.

The judge agreed with Madeleine's counsel, stating she saw no reason why video visitation should not occur, reminding the Division that it was its burden by clear and convincing evidence to establish its efforts to provide services and that termination was in Izzy's best interest. The law guardian noted Darcy had a restraining order against Madeleine and thus could not facilitate visitation and argued that should visitation occur that it should be therapeutically supervised followed by play therapy.

The deputy advised she "didn't anticipate [visitation] being raised" after her "extensive conversations with [the Division] regarding why there was no visitation throughout the FN," again noting "that restraining order that was issued very shortly [after] the . . . removal occurred and has been in place." In her very next sentence, however, the deputy stated that "certainly, the Division is able to set up the virtual visitation. We know about that app now that Camden County uses, and — and we can set that up should that be your honor's order." The judge entered an order the same day, April 5, 2022, directing the Division to set up regular virtual visitation sessions of approximately fifteen minutes between Madeleine and Izzy.

Those sessions took some time to set up, and, as noted, Madeleine was only afforded four such visits of approximately ten minutes each prior to the bonding evaluation. Izzy, who was then three-years-old, did not recognize Madeleine, from whom she'd been separated when she was a little over ten months old. Izzy referred to Madeleine as "the ballerina lady" or "the lady," and while reporting to her play therapist, Wendy Preihs, that "the ballerina lady is nice," Izzy didn't know who Madeleine was or her relation to "the lady."

Darcy, Madeleine's sister and Izzy's resource parent, opposed even virtual visits between Madeleine and Izzy. After the first visit, Preihs' notes in evidence reflect that Darcy had reported that Izzy was engaging in self-injurious behavior, and that Izzy's law guardian told Darcy "that if [Preihs] supports that visitation between [Izzy] and her mother be suspended; and writes a letter to this end; such documentation can be helpful in court." Preihs' notes state she advised Darcy that only the Division or the deputy could request her clinical opinion regarding visitation and she did "not put unsolicited recommendations in writing." When the caseworker solicited Preihs' recommendation as to ongoing visitation two weeks later, Preihs recommended that visitation continue as before under therapeutic supervision.

A-2413-21

The Division's case notes in evidence refer several times to Darcy's efforts to cancel or interfere in Madeleine's visits with Izzy, resulting in the Division moving them from Darcy's home to the Division office. Darcy was particularly disturbed by Madeleine referring to herself to Izzy as "Mom." It was shortly after these visits started and Darcy was advised by the prosecutor's office that Madeleine might not be incarcerated for decades, as Darcy had apparently been led to believe, that she wrote to the Division she was unwilling to adopt Izzy based on her fear of Madeleine. The Division removed Izzy from Darcy's home on August 1, 2022, and placed her with Wally and Wanda for potential adoption.

The Division had Madeleine evaluated by Alan J. Lee, Psy.D. in early August 2022. Dr. Lee authored a report in which he stated "[t]he purpose of the evaluation was to describe [Madeleine's] psychological, emotional, and other areas of functioning related to issues of parenting and caretaking capacity for a minor child, and to make relevant treatment and/or management recommendations." In addition to collateral information obtained from the Division's caseworkers, Dr. Lee engaged in a clinical interview and testing, including the Rorschach Inkblot Method and the same Personality Assessment Inventory (PAI) administered to Madeleine by Dr. Ferguson-Thomas two years prior.

Dr. Lee reported Madeleine's Rorschach inkblot test

> produced fewer responses than typically expected, which generally and likely reflects her defensiveness, guardedness, and simplistic style. She has difficulty managing more complex, vague, and ambiguous situations such as emotionally-laden and interpersonally-based situations. She showed a high level of animal (A) content, and animal movement (FM) determinant, likely reflecting many unmet emotional needs and generally immature style.

On the PAI, Dr. Lee reported Madeleine had no "significant elevations of the common Validity scales" and only "a moderate elevation on [the] Alcohol-Related Problems scale (ALC=61 T)." He also reported Madeleine "showed some elevations on subscales of Anxiety-Related Disorder-Traumatic Stress (ARD-T=60T) and some near moderate elevation of Antisocial Personality Disorder-Antisocial Behaviors (ANT-A=59T)" and "some slight elevation on Paranoia-Hypervigilance (PAR-H=57T)." Madeleine's score on the Child Abuse Potential Inventory, showed no elevation "on the Abuse scale score."

"In synthesizing and integrating the test data, clinical interview, observations, and collaterally-obtained history," Dr. Lee concluded Madeleine

> generally presents as an individual who is psychologically less mature and less developed than most adults, with entrenched and maladaptive personality and character traits that give rise to difficulties in coping and problem-solving. She has

A-2413-21

61

many unmet emotional needs that often drive and compel her to behave in self-serving ways. She has a propensity to be rather self-centered and adheres heavily to her own beliefs and perceptions of situations, which are often erroneous and flawed. She lacks accurate empathy and regard towards others. She often behaves in self-serving ways that fail to acknowledge what others need and want.

Dr. Lee's diagnostic impressions of Madeleine were

Unspecified Disruptive, Impulse Control, and Conduct Disorder

History of Unspecified Other (or Unknown) Substance-Related Disorder

Unspecified Anxiety Disorder

Unspecified Personality Disorder with Antisocial, Borderline, and Narcissistic traits.

He concluded Madeleine "has entrenched and maladaptive personality and character traits that give rise to difficulties in her functioning." He claimed "[h]er knowledge of parenting and childrearing is limited in some areas," and that "[h]er impairments in functioning compromise her ability to function as an independent caretaker of the minor child or minor children, whether she is detained or incarcerated or not." Dr. Lee termed Madeleine's "prognosis for significant and lasting changes is poor," and he did not support her "as an independent caretaker of minor children at this time and within the foreseeable future."

A-2413-21

As already noted, Dr. Lee found that Izzy was not bonded to either Madeleine or Wally. He opined that Izzy had "an ambivalent and insecure attachment and relationship" with Madeleine and there was thus "a low risk of the child suffering severe and enduring psychological or emotional harm if the child's attachment and relationship with the birthmother is permanently ended." Although acknowledging that Izzy did not have "a significant and positive psychological attachment and bond" with Wally, Dr. Lee opined

> it is likely that with the passage of time and all else equal in an appropriate environment it is likely that the child will form a significant and positive psychological attachment and bond with [Wally], and then be at a significant risk of suffering severe and enduring harm if the child's relationship with [Wally] is then ended.

At the guardianship trial, Dr. Lee testified to the opinion expressed in his report. He also testified to a bonding evaluation he conducted between Wanda and Izzy. Although testifying that he could not say Izzy would suffer severe and enduring harm should she be separated from Wanda, he opined there was "a likelihood" of Izzy suffering "some type of negative consequences, . . . by not having [a] consistent, ongoing relationship with [Wanda], whom [Izzy] is . . . very connected to."

In addition to Wally and one of the police officers who arrested Madeleine inside Darcy's home the night she tried to take Izzy, the Division

A-2413-21

63

also presented the testimony of the Division's adoption worker, who assumed responsibility for the case at the end of May 2022. The worker testified from her review of the Division's file that Wanda and Izzy were removed from Madeleine's care on March 2, 2020, due to the Division's concerns for "the substance abuse, the DV . . . and now, you know, the false reporting" following Madeleine's initial arrest.[20] As it relates to the services the Division provided to Madeleine, the deputy led the worker through the following series of questions.

> Q: And now throughout the life of this current litigation the Division did attempt to implement services despite [Madeleine's] incarceration, correct?
>
> A: Correct, yes.
>
> Q: Beginning first with those substance abuse services, what efforts did the Division take?
>
> A: So . . . the substance abuse evaluation it was scheduled and I believe it had to be rescheduled because of the whole COVID pandemic. So, [Madeleine] ended up receiving services through the correction facility. So, she participated, I believe it's called Second Chances, and then she completed that,

---

[20] As already noted, the allegations of substance abuse and domestic violence arising out of the domestic violence restraining order Madeleine obtained against Izzy's father in November 2019, were not established against Madeleine. Indeed, the Division never established substance abuse allegations against Madeleine at any time since the case was first opened in 2015 although Madeleine completed an intensive outpatient alcohol treatment program in 2015 as a part of her parole obligations.

that program while incarcerated. She was set up with the DV liaison. And she did do a telehealth psychological evaluation with Delaware Valley Psychological Services that occurred in September of 2020. And she was recommended for therapy. The Division tried to, you know, work with the jail in order to try to, you know, work out services for [Madeleine]. To my knowledge we don't have like a therapist to be able to do like telehealth therapy. I don't know — everything referral therapist. So, the Division wasn't able to, you know, make that referral. But there was an attempt to work with the jail to see if there was any way to be able to put in services.

Q: And so you indicated the Division did attempt to set up the substance abuse evaluation in March of 2020?

A: Correct, yes.

Q: And that had to be rescheduled due to COVID?

A: Correct, yes.

Q: And you indicated the Division has attempted ongoing to coordinate with the jail?

A: Yes.

Q: The Division aware of any other services [Madeleine] has participated in while incarcerated?

A: I believe she mentioned like art therapy, but that's, you know, what I — [21]

---

[21] During a forty-five-day break in the trial occasioned by the demands of the Indian Child Welfare Act and the Division's decision to obtain a sibling bonding evaluation, the judge ordered the adoption worker to follow-up on

A-2413-21

Q: And so at this time the recommended therapy does still remain outstanding, correct?

A: Correct, yes.

Q: The Division in addition to the services also assessed visitation for [Madeleine], correct?

A: Yes.

Q: So, at the beginning of the case was visitation implemented?

A: So, at the beginning she wasn't allowed to have any kind of visitation. That was from the I want to say restraining order that was in place. So, we were not able to facilitate visitation.

Q: And so it's your understanding there was a no contact order in the restraining order?

---

services that could be provided to Madeleine in detention. When the trial resumed, the adoption worker was recalled. She testified she had recently sent an email to the jail inquiring about programs available to Madeleine. She was advised the person who would ordinarily respond to such inquiries was on maternity leave, but was informed the jail has "DV programming, parenting classes, and also anger management and [the writer] spoke to the person who, I guess, is in charge of those programs," and "was informed that [Madeleine] had previously denied, I guess, participation in those programs." On cross-examination, the adoption worker conceded she hadn't asked Madeleine to sign a release to allow the jail to release her records, believed, although "not a hundred percent sure," that Madeleine had already completed domestic violence classes, knew Madeleine had completed substance abuse treatment in detention, and could not recall whether the art therapy Madeleine was participating in was an anger management program, although the case notes reflect she'd told the worker that "she continues to do art therapy and anger management is ongoing."

A-2413-21

66

A: Correct.

Q: Was there also a no contact order under the FM (sic) litigation?

A: Yes.

Q: And was [Izzy] included in both of those?

A: Yes.[22]

Q: Now, the Division then did ultimately make an application to the Court to begin video visitation, correct?

A: Correct, yes.

Q: And when did that begin?

A: The video visit — I believe visitation was reinstated April, April of this year, '22, yeah.[23]

After hearing the testimony, the judge rendered a comprehensive and thoughtful opinion from the bench explaining her decision to terminate Madeleine's parental rights to Izzy. The judge rejected Madeleine's counsel's argument that Dr. Lee rendered only a net opinion relying on the same

---

[22] As already noted, the Division requested and received a no contact order in the first hearing in the FN case. Although the TRO Darcy obtained against Madeleine included no contact with Izzy, the FRO did not include that provision but instead permitted Madeleine visitation with Izzy "as arranged by DCPP."

[23] Madeleine did not testify in her own behalf and neither she nor the law guardian presented other witnesses or sought to admit any evidence.

psychological jargon present in several other reports in unpublished opinions of this court, which he furnished to the trial court. The judge found "it would be a good argument if . . . the report and the testimony of Dr. Lee wasn't based on the record, based on a multi-method approach used by mental health professionals in the field doing these types of evaluations."

The judge accepted Dr. Lee's findings that Madeleine "was unable to minimally parent [Izzy] now or in the foreseeable future." Alluding to Madeleine's effort to snatch Izzy from her sister's home in the middle of the night, the judge found

> [i]t demonstrated many of the maladaptive character disorders testified by Dr. Lee, lack of attunement, misperception of facts, of rash actions, of poor judgment, of not thinking of others, behaving in a self-serving way, reacting to a situation with poor emotional modulation, of problems with impulse control, lacking insight and awareness, of not being cognizant of not caring about or respecting court orders, not being a role model for a three year old, of not protecting the three year old, of putting herself in a position without thinking . . . where she would potentially be incarcerated and as a matter of just logistics be unable to provide for the daily needs of her young child.

The judge found that even "[p]rior to that incident there were also concerns of unstable relationships, of domestic violence, alcohol. So, it wasn't a perfect

home life for [Izzy] before the removal."  The judge found, however, that "this was the icing on the cake."

The judge found that putting all the evidence into context,

> the Division has proven by clear and convincing evidence that [Izzy's] safety, health or development has been or will continue to be endangered by [Madeleine] and that [Madeleine] is at a minimum unable to eliminate the harm facing the child, as a result of the actions she has taken and her characterological deficiencies, her diagnosis, her substance abuse, her mental health issues, her inability to place [Izzy's] needs first, her inability to self-regulate and follow court orders, avail herself of the court system.  But rather took matters into her own hand in a very brash way with [Izzy] because she wanted [Izzy] to be with her despite the court orders, which jeopardized [Izzy's] safety, health and development.  It was traumatic to her and created a situation in which the child doesn't view her as mom.  Views her as the lady.  Pleasant, but the lady.  Doesn't have a bond with her, but rather has an insecure relationship with her, which is harmful as testified to by the expert.

Finding the Division had established prongs one and two of the best interests standard, N.J.S.A. 30:4C-15.1(a)(1) and (2), the judge went on to consider prong three, the Division's "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home."  N.J.S.A. 30:4C-15.1(a)(3).

A-2413-21

69

Noting the practical difficulties Madeleine's detention had on the provision of services, the judge distinguished this case from N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 556 (2014), in which our Supreme Court reiterated "that incarceration alone — without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard — is an insufficient basis for terminating parental rights."  Focusing specifically on how incarceration affects the Division's third-prong obligation, the judge explained "the reason the Court remanded in R.G., was because the Division paid only cursory attention to the need for services, made no attempts whatsoever."

The judge found the Division's actions in this case were nothing like those in R.G. in which "the Court found that the Division failed to provide the appellant with any services to effectuate a reunification," in a case where the appellant's release was imminent.  Although acknowledging "in a perfect world there'd be a lot more services, a lot more ability, a lot more services in the jail," the judge was "satisfied that the Division [had] made more than reasonable efforts to provide services to [Madeleine] under the circumstances of this case."

The judge found the Division had from the inception of the case in 2015 offered Madeleine "a litany of services," a number of which she had

A-2413-21

participated in and completed, and others which "were unable to be set up." The judge further found that "from the outset of [Madeleine's] incarceration," the Division caseworkers had "repeatedly been in touch with her" and "kept her in the loop," and that "despite her disrespect" toward the caseworkers, they had "persevered in keeping her apprised of the status of the case." The caseworkers had inquired "about what services were available, or any more services available," all of which "[s]he did not avail herself."

The court specifically found the two adoption workers assigned during the pendency of the guardianship case worked diligently "to effectuate the virtual visits" between Madeleine and Izzy, in the face of "a ton of technological problems." Notwithstanding their efforts, the judge noted Izzy didn't want to participate, finding "[s]ome of it is a three-year-old," but "[a] lot of it is she does not have the relationship with [Madeleine]. She does not view her as her mother. She does not view her as a family member. That's the sad hard fact to recognize."

The judge was satisfied there were no alternatives to termination of Madeleine's parental rights at this juncture in light of three-and-a-half-year-old Izzy's need for permanency, having spent the greater part of her life, over two-and-a-half-years, in placement. Finally, the judge found that given Dr. Lee's assessment of the "ambivalent and insecure attachment" between

A-2413-21

Madeleine and Izzy and that Izzy was "in the process of solidifying a significant and positive psychological attachment and bond" to Wally, which "every day she gets closer and closer to solidifying," the Division had established that Izzy "will not suffer a greater harm from terminating ties with her biological mother [Madeleine] than from the permanent disruption of her relationship with [Wally] and removing her from the home where she is with her half-sister" Wanda.

The parties' arguments on appeal

Madeleine contends the trial court erred in finding the Division established all four prongs of the best interests test because it assumed parental unfitness and that Izzy was harmed in Madeleine's care without competent proofs, improperly admitted the net opinions of Dr. Lee, which were speculative and without support in the evidence, that the Division harmed Izzy by removing her from Madeleine's care in the face of corroborated statements by Wanda that Wally had inappropriately touched her and refusing to admit that evidence in the guardianship case as irrelevant, and improperly weighed the bonding evaluations. Madeleine also maintains she received ineffective assistance of trial counsel.

The Division and the law guardian urge we affirm the termination of Madeleine's parental rights to Izzy as the trial court properly found the Division had proved all four prongs of the best interests test by clear and convincing evidence, and Madeleine did not receive ineffective assistance from her counsel.

The controlling law and our analysis of the court's decision to terminate parental rights

Our standard of review of a court's decision to terminate parental rights is well established. We ordinarily accord deference to the Family Part based on its special jurisdiction and expertise. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998). We defer to the court's factual findings if supported by adequate, substantial and credible evidence in the record. R.G., 217 N.J. at 552. The scope of our review, however, is expanded "where the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom." Ibid. (alteration in original) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). Our review of questions of law is, of course, de novo. Nicholas v. Mynster, 213 N.J. 463, 478 (2013); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

As our Supreme Court has instructed, "[p]arental rights, though fundamentally important, are not absolute." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). A parent's constitutional right to raise his or her child is tempered by the State's parens patriae obligation to protect that child's welfare. Ibid. A court balances those two conflicting ideas by faithfully applying the statutory best interests of the child standard to the evidence presented at a guardianship trial. Ibid. Termination of a parent's rights to his or her child may be ordered only upon the State's clear and convincing proof of each of the following four prongs of the best interests standard:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

As we noted at the beginning of this opinion, these cases are troubling. Were we hearing this guardianship case in the first instance, we may well have had some doubt as to whether the Division proved the first two prongs of the best interest standard by the required clear and convincing standard. Although the trial judge accepted the adoption worker's testimony that Wanda and Izzy were initially removed from Madeleine's care in March 2022, based on the Division's concerns for "the substance abuse, the DV, . . . and now, you know, the false reporting," the Division's record establishes beyond all peradventure that the charges of substance abuse and DV were only established against Izzy's late father. The DV and substance abuse referrals against Madeleine arising out of the domestic violence incident in November 2019, in which she was the victim, were not established.

Indeed, before the March 2020 false reporting charge, the Division had never established any dereliction in Madeleine's care of her children in the nearly five years it had been involved in her family's life. When the case was first opened in 2015 after Madeleine's alcohol-fueled argument with her sister, Madeleine agreed to the Division's request for a substance abuse evaluation. That evaluation was conducted through parole, and Madeleine followed up the evaluation by successfully completing an intensive outpatient substance abuse

75

A-2413-21

program, although she'd never tested positive for drugs or alcohol during her parole term according to her parole officer.

After that time, the Division's record discloses only two problematic screens out of the dozens, many of them random, the Division had her complete; the breathalyzer in 2018, when the alcohol in her system was found to be below the legal limit to drive and the sample rejected in November 2019 the day after the domestic violence incident with James. A ten-panel screen administered the following week without notice, however, detected no drugs or alcohol in Madeleine's system.

There is no question but that Madeleine refused the Division's several requests to undergo another substance abuse evaluation after 2015 — absent a court order — although she submitted to drug screens whenever the Division asked. The Division's records also make clear the caseworkers were twice told in the fall of 2019 by the deputy assigned to the case that there was insufficient evidence of Madeleine's abuse of alcohol to warrant requesting a court to order her to undergo a substance abuse evaluation. That apparently did not stop the caseworker and her supervisor, inappropriately in our view, from advising the court in the FD action in February 2020, that Madeleine was not complying with the Division's recommendations for a substance abuse evaluation, resulting in an FD order that Madeleine comply with the Division's request.

A-2413-21

The Division's own extensive records thus raise some doubt over the caseworkers' concern that Madeleine was abusing alcohol in 2019 or 2020. Moreover, the Division having not substantiated the most recent charges of substance abuse and domestic violence, one might reasonably question the basis of Izzy's removal, which occurred before Madeleine was arrested for attempting to kidnap her, but after Madeleine's criminal charges of false reporting and child endangerment, which relate only to Wanda and her father Wally, who is not Izzy's father. The supervisor's explanation to Madeleine fifteen months later that "child endangerment would apply to all children in her care," is not a particularly satisfying one to us.

And although the trial judge accepted Dr. Lee's opinion that Madeleine "was unable to minimally parent [Izzy] now or in the foreseeable future," his opinion appeared to ignore the facts in the record that suggested Madeleine had been an adequate parent to her children prior to their removal in 2020. Specifically, the Division's records confirm Madeleine had provided the children with stable housing, and the caseworkers had reported at every visit with Madeleine that her home was clean and neat, well-stocked with food and that the children appeared well-cared for.

Although there are indications that Madeleine was often under financial stress, the Division's positive reports of the well-being of the children over

several years do not square with Dr. Lee's conclusion that Madeleine was incapable of serving as a minimally adequate parent to them. In addition, neither counsel nor the court asked Dr. Lee why his psychological assessment of Madeleine differed so dramatically from the one performed by Dr. Ferguson-Thomas two years before using some of the same test instruments, and whether any of the differences could be attributed to having spent those two years in detention with no contact with her children.

But we may not "appraise the record as if [we] were deciding the matter at inception and make [our] own findings and conclusions," State v. Johnson, 42 N.J. 146, 162 (1964), because there is, without doubt, substantial evidence, which the judge deemed credible, to support her findings that the Division carried its burden to establish that Madeleine's actions in breaking into her sister's home in the middle of the night to take Izzy after being barred by court order from any contact with the child "demonstrated many of the maladaptive character disorders testified by Dr. Lee, lack of attunement, misperception of facts, of rash actions, of poor judgment, of not thinking of others, [of] behaving in a self-serving way, [of] reacting to a situation with poor emotional modulation," as well as "her inability to place [Izzy's] needs first, her inability to self-regulate and [to] follow court orders," all of which demonstrated that Madeleine had endangered Izzy's safety, health or development, and that

A-2413-21

Madeleine is unable to eliminate the harm and provide Izzy a safe and stable home.

We do not agree, however, that the trial judge's finding that the Division had made reasonable efforts to provide Madeleine with services to assist her in correcting the circumstances that led to Izzy's placement has that same support in the record. It does not. Although the court found this case distinguishable from R.G., the only distinguishing feature we find is that the Division's actions here were worse and deliberately so.

The defendant in R.G. moved in with his partner and her two-year-old-son in 2000. 217 N.J. at 535. Their daughter Tara was born in early 2004. Id. at 536. The defendant worked full-time, supporting the family and acting as a father to both children. Ibid. Six months after Tara was born, the defendant started serving a five-year prison sentence. Id. at 540. The children remained in the custody of their mother. Id. at 536. Although the defendant spoke regularly to her about the children, he chose not to have them visit him in prison given their young ages. Ibid.

The Division removed the children from their mother, R.G. in 2008, placing them with their maternal grandmother, to whom R.G. later relinquished both children in an identified surrender. Id. at 536-37. The guardianship trial thus proceeded in 2010, when the defendant was a few

months away from his scheduled release date, only against the defendant and only in regard to Tara. Id. at 537-39. We focus solely on the services the Division provided the defendant in prison and the Court's findings as to their adequacy.

The caseworker in R.G. testified "the Division generally provides no particular services, such as substance abuse treatment or parenting skills, to incarcerated persons," and "as far as she knew, psychological evaluations were the only services that the Division provided to inmates." A review of the Division's case notes reflected one in-person meeting with the defendant in the prison in 2008 when the children were removed and a telephone call in 2010 to discuss with defendant their placement with their grandmother. Id. at 538. Five months before the guardianship trial, a Division caseworker wrote to the prison "requesting information about [the defendant's] participation in programs," although the Division never attempted to compare what was available to him in prison with the Division programs. Id. at 539. The defendant testified the Division never facilitated telephone contact between him and his daughter by providing him pre-paid phone cards and only started encouraging the children to write to him in response to his cards and letters in late 2009 after he complained, and even then the Division screened their written exchanges. Id. at 541.

Based on the testimony and the Division's record in evidence, the Court in R.G. found the Division never paid more than "cursory attention to [the defendant] from the outset of its involvement with his family," visited him only one time in prison, called him only once, did not work to facilitate his contact with Tara, and never studied the programs available to him and compared them to those offered by the Division, or suggested he enroll in any particular prison program. Id. at 562-63. Acknowledging that "providing services to incarcerated persons is difficult and may be futile," the Court nevertheless held "the Division must do more than merely speak with the parent and provide two psychological evaluations" in order to fulfill its obligations to an incarcerated parent under the third prong. Id. at 563.

The Court in R.G. reiterated the Division's "reasonable efforts" under the third prong "include consulting with the parent, developing a reunification plan, providing services essential to realizing the reunification plan, informing the family of the child's progress, and facilitating visitation." Id. at 557 (citing N. J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007)). The Court held "[t]he Division 'must monitor the services, change them as needs arise, and identify and strive to overcome barriers to service provision or service utilization.'" Ibid. (quoting In re Guardianship of D.M.H., 161 N.J. 365, 387 (1999)). The Court concluded "[t]he Division must 'encourage, foster

and maintain' the parent-child bond, 'promote and assist in visitation,' . . . and inform the parent of the 'appropriate measures he or she should pursue . . . to . . . strengthen' their relationship." Ibid. (quoting D.M.H., 161 N.J. at 390).

The Division did none of that here — at least not until the guardianship judge ordered video visitation between Madeleine and Izzy, over two years after the Division removed the children from her care and obtained the order it asked for on March 4, 2020, barring Madeleine from any contact with Izzy, then ten months old, notwithstanding the false reporting and endangering charges related only to five-year-old Wanda.

As we've already made clear, we in no way condone Madeleine's incredibly reckless acts in taking Wanda from Wally's house in the middle of the night and using a crowbar to break into her sister's house to try and take Izzy. But neither do we accept the Division's actions in blocking all contact between ten-month-old Izzy and her mother for the next two years, so that when video visitation was finally established, not, as the caseworker testified, on the "application" of the Division, but on the order of the guardianship judge who'd newly assumed responsibility for the case, the child didn't recognize Madeleine as her mother, referring to her only as "the ballerina lady" or "the lady."

A-2413-21

Notwithstanding the Court's clear direction to the Division in <u>R.G.</u> that it "must 'encourage, foster and maintain' the parent-child bond, [and] 'promote and assist in visitation,'" between incarcerated parents and their children in the Division's custody, the Division failed to even attempt to do so here. Similar to <u>R.G.</u>, the Division's records reveal only one phone call and one visit to Madeleine during the first fifteen months of her detention. During the long period in which the FN litigation involving Wanda dragged on, the caseworkers never attempted to consult with Madeleine to form a plan for her reunification with Izzy, despite the law guardian and the deputy's acknowledgement to the FN judge that Izzy was becoming bonded to her aunt and uncle. The workers didn't educate themselves on the services available to Madeleine in detention, didn't inquire whether they'd changed over time or make efforts to help ensure Madeleine got the services she needed to give her a reasonable chance of being reunited with Izzy.

The record makes clear the programs and services of which Madeleine availed herself, which the Division didn't keep track of, were done on her own initiative without assistance from the Division, including a substance evaluation and four months of substance abuse treatment. Although in <u>R.G.</u>, a caseworker didn't reach out to the prison until five months before trial to learn what programs the defendant had taken during his nearly five years in prison,

R.G., 217 N.J. at 538, here that contact did not occur until the middle of the guardianship trial, resulting, unsurprisingly, in an unsatisfactory email response from the jail lacking any specifics and apparently relying on the hearsay outreach to a counselor on maternity leave.

The Division did arrange for a psychological evaluation of Madeleine by video in August of 2020, but never offered her the therapy the psychologist recommended. The adoption worker who testified at the trial simply asserted it was a service "to [her] knowledge" the Division didn't provide, never explaining why the Division could manage a multi-hour telehealth evaluation of Madeleine in September 2020, and supervised video visitation in April 2022, but could not provide a psychologist to undertake regular video telehealth sessions with Madeleine at any time during her detention.

The distinction between this case and R.G., is that instead of simply failing to facilitate contact between the defendant and his daughter as the Division did in R.G., here the Division affirmatively acted to block all contact between Madeleine and Izzy, without any expert report as to why that might be necessary or advisable, and all the while telling Madeleine and various judges that the no contact provision arose out of a domestic violence restraining order, or a criminal court order, or pending an investigation by the prosecutor's office or even an investigation by the Division, none of which appears to have been

true. The record makes clear the first no contact order entered in this case was the one the Division requested and obtained on March 4, 2020, and that the subsequent release order entered by the Criminal Part the following day and the final restraining order entered in the domestic violence matter each acknowledged that visitation between Madeleine and Izzy would be by order in the children-in-court actions.

Significantly, the Division advised the judge at the first hearing in the guardianship proceeding it did not intend to even seek a bonding evaluation between Madeleine and Izzy, given there'd been no "visitation for two years now," clearly implying that whatever bond existed between Madeleine and ten-month-old Izzy would have long since been obliterated by the long interval with no contact between them.

We do not doubt that the COVID-19 pandemic precautions made any services the Division tried to provide families more difficult especially in the early months of the pandemic just as this case got underway. But this record is devoid of any but the most general comments on the effect of the pandemic on the services here. And as the Division was obviously able to set up video visitation when it was ordered to do so in April 2022, there is nothing to suggest it could not have done so earlier. See N.J.S.A. 30:1B-6.9(a), the "Dignity for Incarcerated Primary Caretaker Parents Act," effective August 1,

2020, requiring "[t]he chief executive officer or warden of each county correctional facility" to "establish policies that encourage and promote visitation, particularly for inmates who are primary caretaker parents."

The Division never squarely argued in the trial court that visitation would be harmful to Izzy, nor could it have as it had never had the child evaluated after Madeleine tried to take her from Darcy's house, apparently believing that neither an evaluation nor therapy was necessary.[24]  It simply continued, month after month, to advocate the original no contact order remain in place — which it did until the guardianship judge would brook no argument in ordering the Division to establish supervised video visits at the first case management conference in the guardianship action.

We do not suggest that Izzy would not have been harmed by Madeleine's actions; she might have been, and supervised video visitation might not have been appropriate.  Our point is that the Division was required to establish it, not assume it.  Most critically, the Division was simply not free to block the visitation Madeleine continuously sought with Izzy without seeking relief

---

[24]  The trial judge stated at one point in her ruling that Madeleine's having taken Izzy from Darcy's home as she did was "traumatic" to Izzy.  There is no competent proof in this record that Izzy suffered any trauma from that incident, see S.S., 372 N.J. Super. at 22-23 (explaining a court cannot assume emotional harm to a child in the absence of expert testimony), and we view it as no more than a stray remark.

under N.J.S.A. 30:4C-11.3 "from its statutory obligation under N.J.S.A. 30:4C-11.1(b) to exert 'reasonable efforts' to reunify the child, placed in its care and custody by the court, with that parent." N.J. Div. of Youth & Fam. Servs. v. A.R.G., 361 N.J. Super. 46, 52 (App. Div. 2003) aff'd as mod., 179 N.J. 264, (2004); N.J.S.A. 30:4C-15.1(c) and (d). That was especially true here, as Madeleine was only in pre-trial detention; she had not been tried, much less sentenced, and thus the length of her continued incarceration always remained uncertain. As our Supreme Court has noted, the "agency's attempt to discourage visitation between biological parents and children is irreconcilable with [its] statutory duty 'to encourage and strengthen the parental relationship.'" D.M.H., 161 N.J. 365, 389-90 (1999) (quoting In re La Freniere, 420 A.2d 82, 84 (R.I. 1980)).

Because the Division failed to comply with its statutory obligation under N.J.S.A. 30:4C-11.1(b), 30:4C-15.1(a)(3) and 30:4C-15.1(c)(4) to assert reasonable efforts to reunify Izzy with Madeleine at any time after her removal in March 2020, by failing to "encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family" and to "promote and assist in visitation," D.M.H., 161 N.J. at 390, it failed to establish its third-prong burden to undertake reasonable efforts to promote their reunification, requiring reversal of the guardianship judgment "standing

alone."  See N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 182 (2010) (holding "inadequate visitation plans" consisting of one hour per week of supervised visitation in the Division's offices with the defendant's eleven-month-old son "standing alone, should have caused the rejection of any application seeking the termination of defendant's parental rights").  The few efforts the court required the Division to undertake after it filed its guardianship complaint in February 2022 cannot make up for its failures for the first two years Izzy was in placement.

Further, the Division's failure to "encourage, foster and maintain the bond" between Madeliene and Izzy and its efforts to block all contact between them without the benefit of any expert opinion that visitation would be harmful to ten-month-old Izzy adversely affected the fourth-prong analysis.  See I.S., 202 at 182 (noting that had the Division "satisfied its statutory obligations in a meaningful manner and engaged in substantive reconciliation efforts on behalf of [the] defendant and his son, . . . the resulting expert opinions perforce would have been different").  As Dr. Lee could not opine there was a secure bond between Izzy and Wally but only the likelihood that "with the passage of time and all else equal in an appropriate environment" Izzy would bond with Wally, "and then be at a significant risk of suffering severe and enduring harm" were their relationship ended, the evidence was insufficient, in the face of the

Division's failure to promote visitation between Madeleine and Izzy, to find the Division had established by clear and convincing evidence that terminating Madeleine's parental rights to Izzy would not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). See also R.G., 217 N.J. at 562-63 (holding the Division's failure to provide incarcerated father "with sufficient services in order to effectuate a successful reunification," undermined factual support for second-prong finding that father was unable or unwilling to eliminate harm to the child). Our disposition makes it unnecessary to consider Madeleine's ineffective assistance of counsel claim.

The judgments in A-2413-21 and A-1371-22 are reversed. The matter is remanded to the trial court under the FN docket to establish a permanency plan for Izzy that will provide for a meaningful opportunity for her reunification with Madeleine under the oversight of the court. We do not retain jurisdiction.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION